UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


MICHAEL L. MORGAN,                )
                                  )
      PLAINTIFF,                  )
                                  ) DOCKET NO. 1:10-CV-3555-AT
      -VS-                        )
                                  )
OCWEN LOAN SERVICING, LLC,        )
ET AL.,                           )
                                  )
      DEFENDANTS.                 )


TRANSCRIPT OF ELECTRONICALLY RECORDED SETTLEMENT CONFERENCE
BEFORE THE HONORABLE LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE
THURSDAY, SEPTEMBER 15, 2011


<u>APPEARANCES</u>:

ON BEHALF OF THE PLAINTIFF:

      MICHAEL L. MORGAN, PRO SE

ON BEHALF OF THE DEFENDANT OCWEN LOAN SERVICING, ETC.:

      KENT E. ALTOM, ESQ.
      MEREDITH BARNES, ESQ.

ALSO PRESENT:

      NICHELLE JONES


<u>TRANSCRIBED BY</u>:
ELISE SMITH EVANS, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

1      (Thursday, September 15, 2011; Atlanta, Georgia.)

2      THE COURT:  Okay.  The Court calls the case of Michael

3  Morgan versus Ocwen Loan Servicing, LLC, and Mortgage Electronic

4  Registration Systems, Inc.  This is case number 1:10-cv-3555.  We

5  have appearing on behalf of the plaintiff, he is pro se.  Good

6  morning, Mr. Morgan.

7      MR. MORGAN:  Good morning.

8      THE COURT:  We have appearing on behalf of Defendant

9  Ocwen Loan Servicing, LLC, we have Kent Altom.  Good morning.

10  And Meredith Barnes.  And it is my understanding we have a

11  corporate representative, Nichelle Jones.  Okay.  Good morning.

12      Okay.  We're here this morning because this case has

13  been referred to me for a mediation or settlement conference.

14  I -- there's a little bit of delay in the proceedings because I

15  was made aware that there was an emergency motion filed by the

16  plaintiff.  I was reviewing that motion.  And I'm surprised at

17  some of the facts provided in that emergency motion.

18      We can start with an opening statement, but it -- based

19  on what I've read from the -- and I was just presented with the

20  plaintiff's confidential settlement statement -- what I read in

21  Judge Totenberg's order on the docket, as well as Judge Thrash's

22  order -- I do not have what actually was said during the TRO

23  hearing that he had.  But I do realize that the claims that

24  survived the Motion to Dismiss at this juncture and those claims

25  that were denied, the plaintiff's claims for declaratory

1  judgment, cancellation of a security deed, slander, title and

2  quiet title were dismissed by the Court, so they are no longer

3  before this Court.  And plaintiff's Motion to Dismiss -- I'm

4  sorry, in plaintiff's claims for injunctive relief, wrongful

5  foreclosure, negligence, and intentional infliction of emotional

6  distress and RICO remain as the defendant did not seek summary

7  judgment -- oh, I'm sorry, dismissal of those issues.

8       Now, I'm pretty familiar with the facts based on the

9  documents provided to the Court.  What is not clear now based on

10 the defendants -- plaintiff's, I'm sorry, emergency motion is was

11 there a foreclosure or not.  Everything that I read prior to the

12 emergency motion I guess I thought there was not a foreclosure,

13 that there was notice that was filed, and then that notice was

14 taken back or removed.  And, then, plaintiff filed this motion

15 now and says there was foreclosure during the TRO, the permanent

16 injunction, which surprisingly would not have come out prior to

17 this emergency motion.

18       So, if someone can let me know the posture of the case.

19 And I'll give you an opportunity to speak, too, Mr. Morgan.

20       MR. MORGAN:  I just want to clarify that -- you know,

21 so there's no misunderstanding that there was a TRO in place.

22 There was notice of foreclosure, publication notice, in December.

23 The dissolution of the -- there was a dissolution of the

24 preliminary injunction on January 3rd, and there was a

25 foreclosure sale on January 4th.  And, then, there was a

subsequent deed under power recorded in March.

THE COURT:  Okay.

MR. ALTOM:  Your Honor, Kent Altom, again, for both Ocwen and the MERS defendant.

THE COURT:  MERS.

MR. ALTOM:  We came before Judge Thrash last fall.  A TRO had been entered without a hearing.  And there was a hearing on renewing or extending that TRO.  At that hearing I informed the Court that the foreclosure was not going forward on the date set, that that foreclosure -- and I believe it was November was the sale date.  And I told the judge --

THE COURT:  That's November of 2010?

MR. ALTOM:  And that's the -- 2010.  And I told the judge that that sale had been cancelled.  And the judge did not renew or extend, whatever term you want to use, the TRO.  The minute entry that was entered said that it was moot, meaning based upon my representation that that sale was not going to go forward.

And the judge instructed Mr. Morgan that if they go forward with another foreclosure, notice, advertisement, that he can renew his motion at that time.

The issue with the first foreclosure sale, the one set for November, was because the property at issue is not the primary residence of Mr. Morgan.

THE COURT:  Is that the 911 -- that was another

1  confusion to me.

2  MR. ALTOM:  That's the Addison Court is his primary

3  residence.  The subject property he refers to as Bent Tree.

4  THE COURT:  Okay.  That's the 911?  He mentions in the

5  complaint 911, but I went back to say what is 911?  It was sent

6  to 911 --

7  MR. ALTOM:  It's an undefined term.

8  THE COURT:  Okay.

9  MR. ALTOM:  Right.  And he was saying that we -- in

10  connection with the first foreclosure sale that was set, we had

11  given notice to the property address, but not to an alternative

12  address, which is his primary residence.

13  THE COURT:  Okay.  That makes sense.  Okay.  That's --

14  MR. ALTOM:  And, so, Weisman Nowak was foreclosure

15  counsel, and they pulled that, voluntarily pulled it, that sale.

16  And it was made quite clear on the record by Judge Thrash that he

17  was not going to renew or extend.  The minute entry says that it

18  was moot.  And I believe it was on December 29th that the order

19  was entered with the word "extinguished."  Okay?

20  So we had a first foreclosure set, voluntarily

21  withdrawn, the TRO was not renewed or extended at the hearing,

22  the minute entry said that it was moot.  And I'll also remind the

23  Court, if a TRO order does not have a date on which it expires,

24  it expires automatically in 14 days.  So, there was an order

25  entered about six weeks after the hearing where the word

1    "extinguished" was used.

2        The sale did go forward on January, and that was

3    properly noticed and properly advertised.

4        What we're dealing with now --

5        THE COURT:  Well, let me ask you this.  How can you

6    modify it if he's already been foreclosed on?  So, why would

7    Judge Totenberg --

8        MR. ALTOM:  Well, that --

9        THE COURT:  -- you know, direct you to send him

10   modification documents if he's already been foreclosed on?

11       MR. ALTOM:  Your Honor -- and I don't want to use --

12   I'm not talking out of both sides of my mouth when I use the word

13   "theoretically."  There are plenty of post-foreclosure sale

14   modifications.  The issue that we've got here is we provided Mr.

15   Morgan back in August, August 12th I believe, a complete loan

16   modification paperwork, what they call the documents needed

17   for --

18       THE COURT:  Let me ask you this -- interrupt you again.

19       MR. ALTOM:  Sure.

20       THE COURT:  Did Judge Totenberg know that he had

21   already been foreclosed on?  I mean, I just am not sure did she

22   know that.

23       MR. ALTOM:  I don't -- I don't know that she knew that.

24       THE COURT:  Okay.  Because she may have assumed, like I

25   did until I got his motion, that the -- that the property was --

1  that he was still in the property and that --

2          MR. ALTOM:  Right.

3          THE COURT:  -- he could modify.

4          Let me ask you this, then.  So, this is my first time

5  seeing a post-foreclosure modification.  I'm only aware of those

6  modifying who are still in the residence.  So, has that

7  property -- is it still -- has that property been sold or it's

8  just sitting there?

9          MR. ALTOM:  If I may.

10         THE COURT:  Okay.

11         MR. ALTOM:  Foreclosure in January.  The eviction

12 followed.  The property was transferred to Freddie Mac, which is

13 the investor on the loan.  At this juncture if there's to be any

14 modification, whereas pre-foreclosure it could be approved by

15 Ocwen based on completed documents by Mr. Morgan, At this

16 juncture Ocwen's role would be to facilitate that modification,

17 but it would have to be approved by Freddie Mac.  There is such

18 things -- and I'm looking at you and I'm making sure every word

19 that comes out of my mouth is accurate.  We just have a

20 additional party that would have to approve the modification, and

21 that would be Freddie Mac, because the foreclosure went forward.

22 There was no TRO in place when the foreclosure went forward.

23 That is a -- and I'll yield in a moment to Mr. Morgan to state

24 which -- what he wishes about it.  But it expired by its own

25 terms.  It expired because it wasn't extended by the judge and

1  the minute entry said it was moot and it was extinguished by

2  order all before the sale was (unintelligible).

3        THE COURT:  Okay.  Let me say this -- and you're going

4  to get a chance, Mr. Morgan.  I know you're champing at the bit

5  to get up.  I will give you a chance to fully air your concerns.

6  But I just want to make sure I understand procedurally what's

7  going on.

8        Okay.  So the house, after the foreclosure, was sold by

9  Freddie Mac or was --

10        MR. ALTOM:  It was sold -- it was taken to sale by

11  Ocwen --

12        THE COURT:  Okay.

13        MR. ALTOM:  -- as the holder of the note and the

14  security deed.

15        THE COURT:  And who did it -- who -- someone purchased

16  it or --

17        MR. ALTOM:  No one purchased it.

18        THE COURT:  Okay.

19        MR. ALTOM:  It went back to Ocwen.  But by special

20  warranty deed, once a foreclosure has happened, it's transferred

21  to Freddie Mac.

22        THE COURT:  Okay.

23        MR. ALTOM:  And just for the Court's understanding --

24  and by analogy, I had a Freddie Mac loan personally and I didn't

25  even know Freddie Mac was the investor.  And what I want to be

1  clear is Freddie and Fannie stand in the background, as you may

2  well know.  And the dealings that a borrower has is with the

3  likes of Ocwen.  Okay?  But once that foreclosure is completed by

4  special warranty deed, it's conveyed, whether it be HUD, Fannie

5  Mae, Freddie Mac.  So, now the title owner is Freddie Mac, not a

6  party to this, and they would have to approve any modification.

7  It doesn't mean it can't happen.

8          THE COURT:  Okay.

9          MR. ALTOM:  It can't happen now because there was no

10 paperwork completed.  And also, based on what I've seen in the

11 statement that was filed on Tuesday, we've not had a service copy

12 of what was submitted this morning, but now we have a complaint

13 that complained of a foreclosure that never happened.  And now we

14 have Mr. Morgan complaining about another foreclosure.  There's

15 no allegations whatsoever in the complaint with respect to that.

16 And to amend a complaint would be leave of court.

17          So I'm just putting -- there's a lot of procedural

18 things that would have to happen if a case goes forward.  There's

19 a lot of practical things that haven't been done.  And that is,

20 to provide the paperwork, which we did on August 12th.  And,

21 then, last week we followed up by e-mail to Mr. Morgan, which

22 he's used an e-mail account with us and said we've not received

23 it back.  There's nothing that we can consider without getting

24 it.  He didn't do it.

25          THE COURT:  Okay.  Let me -- I'm just going -- let me

1  clear up my questions again.  Okay.

2          MR. ALTOM:  Sure.

3          THE COURT:  So, what's the status of the house?  It's

4  just sitting there empty?

5          MR. ALTOM:  It's -- it's in Freddie Mac's --

6          THE COURT:  I mean, but physically it's just sitting

7  there empty --

8          MR. ALTOM:  It's sitting there.

9          THE COURT:  -- nobody's in the house?

10         MR. ALTOM:  No.

11         THE COURT:  And nobody's been in it since January of

12 last year?

13         MR. ALTOM:  Well, soon thereafter.  Whenever the

14 lockout occurred.

15         THE COURT:  Well, yes, after the foreclosure.

16         MR. ALTOM:  Right.

17         THE COURT:  So the house is just sitting there?

18         MR. ALTOM:  And it's in Freddie Mac's portfolio, but

19 again Ocwen is still --

20         THE COURT:  I understand.

21         MR. ALTOM:  -- called the servicer with respect to

22 Freddie Mac.

23         THE COURT:  Okay.  And, so, the plaintiff was residing

24 there or someone?

25         MR. ALTOM:  No.

1         THE COURT:  Or else he had renters there?

2         MR. ALTOM:  No.

3         THE COURT:  Who was -- who was -- whose property was --

4         MR. ALTOM:  The representation --

5         THE COURT:  -- removed from there?

6         MR. ALTOM:  The representation that was made to Judge

7 Thrash was that it is on the way to the north Georgia mountains

8 and that it was used as a weekend or a vacation home.

9         THE COURT:  Okay.

10        MR. ALTOM:  You may -- may want to correct me.

11        MR. MORGAN:  Yes.

12        THE COURT:  Okay.  And we'll get to that.

13        MR. MORGAN:  Yes, that's -- yeah, I'm --

14        MR. ALTOM:  They may live off and on, but they had two

15 residences.  I don't think you had renters in there is what she's

16 asking.

17        MR. MORGAN:  No.  No.  There were no renters at the

18 time.

19        MR. ALTOM:  It was a secondary residence.

20        THE COURT:  Okay.  Now --

21        UNIDENTIFIED VOICE:  (Unintelligible).

22        THE COURT:  Okay --

23        UNIDENTIFIED VOICE:  The real estate was listed on the

24 MLS.

25        THE COURT:  Okay.  Let me go back to the occupant.

1  Now -- okay.  I guess the Court's concern -- one of the Court's

2  concerns that I have is even if he were -- let's just say he were

3  in the -- Mr. Morgan was inclined to go forward with the

4  modification.  Let's just say best case scenario for defendant,

5  he's inclined to go forward with the -- at least for the purpose

6  of the mediation, go forward with the modification.  What's to

7  say he filed out the paperwork and then Fannie Mae says no?

8             MR. ALTOM:  Well --

9             THE COURT:  I mean, he's still where he is today.

10            MR. ALTOM:  Well, I will tell you, and I don't mean any

11  disrespect to Mr. Morgan, his wife, or the Court, but with

12  modifications, it takes two parties.  And we don't have any

13  completed documents, although he's had them in hand for over a

14  month, to even evaluate him for a modification.  But he would

15  still have to show certain things; income, employment, whatever

16  the requirements that Ocwen knows that Freddie would require on

17  one of its modified loans.  And, you know, I mentioned

18  employment, income.  They look at hardship, what was the cause

19  for the payments not to be made.  And all of that would have to

20  be evaluated.

21            We have a representative here.  We provided the

22  paperwork.  And, again, he's not responded.  And I think in the

23  most recent things, he's not only said, well, I'm not really

24  complaining as much about the foreclosure back in November.  But

25  this one going forward in a TRO, I represent to the Court there's

1  no problem with that one.  And he's kind of shifted to, well,

2  maybe I want damages, not a modification.

3          THE COURT:  And how -- let's go back to the foreclosure

4  that's at issue in the initially filed complaint that has not yet

5  been amended.  In that foreclosure was the plaintiff behind?  If

6  so, how much?

7          MR. ALTOM:  He was behind, and we don't know the --

8          THE COURT:  You're going to get up.  You're going to

9  get up --

10          MR. ALTOM:  We don't know the --

11          THE COURT:  You're going to get up.

12          MR. ALTOM:  We don't know the number of months.

13          THE COURT:  She can take -- you can take notes and then

14  you can go over all the same questions again and give me your

15  responses, or I can go back over my questions.

16          MR. ALTOM:  There was a payment default.  As to how

17  many months, I cannot tell you.

18          THE COURT:  Okay.

19          MR. ALTOM:  It's something we can find out for Court.

20          THE COURT:  And one of the issues in the underlying

21  complaint was who was the holder of the note and the deed.  The

22  complaint alleges that -- I mean, the problem is it transferred

23  hands so many times.

24          MR. ALTOM:  Well --

25          THE COURT:  So --

1          MR. ALTOM:  And I casually say in the eyes of the Court

2  it transferred hands many times.  Doing this every day --

3          THE COURT:  Reading the plaintiff's --

4          MR. ALTOM:  -- it really wasn't --

5          THE COURT:  -- complaint, accepting the allegations in

6  the complaint as true, it appears to have changed hands many

7  times.

8          MR. ALTOM:  Well, Guaranteed Rate, Inc. was the

9  originating lender.

10          THE COURT:  Right.

11          MR. ALTOM:  And it transferred to Taylor Bean &

12  Whitaker Mortgage Company.

13          THE COURT:  And then they went out of business.

14          MR. ALTOM:  And they transferred to Ocwen.  So, there

15  were only two transfers of the note.

16          THE COURT:  And the --

17          MR. ALTOM:  And I know that's --

18          THE COURT:  -- when did MERS come in?  When did MERS

19  come into the picture?

20          MR. ALTOM:  MERS is only on the security deed as

21  nominee for Guaranteed Rate, Inc., its successors and assigns.

22  So, they held the security deed, and we can talk about what their

23  role is and what the implications of that is if the Court needs.

24          THE COURT:  Okay.  Let me ask you this, too.  And I'm

25  going to let plaintiff get up.  The authority of the corporate

1  representative today is -- I just want to make sure -- are we

2  talking solely about modification at this juncture?

3          MR. ALTOM:  The --

4          THE COURT:  I want to just cut to the chase.  That

5  tells me how long of a day I'll have --

6          MR. ALTOM:  That --

7          THE COURT:  If the only remedy that the corporate

8  representative have at this juncture is him submitting paperwork

9  for modification, then it's going to probably be a short day.

10         MR. ALTOM:  Yeah.  The -- there can be no consideration

11  of a modification unless the paperwork that's been provided is

12  completed in full and submitted to Ocwen.

13         THE COURT:  Let me ask you this.  How did modification

14  even come up?  How did -- I mean, where did that come up in

15  the --

16         MR. ALTOM:  Judge Totenberg.

17         THE COURT:  Oh, okay.

18         MR. ALTOM:  Judge Totenberg.  And I think there were

19  two orders, one from Your Honor and one from Judge Totenberg

20  about -- and I think yours kind of followed.

21         THE COURT:  I saw hers, but I wasn't sure if there was

22  some telephone conference or discussion with the parties, because

23  that's rare that we see that.  So, okay.

24         MR. ALTOM:  No, it --

25         THE COURT:  I just wasn't sure if that came -- how that

1   came about.

2           MR. ALTOM:  That was --

3           THE COURT:  In the proceedings.  I just couldn't find

4   that in anything that I read that that was on the table.

5           MR. ALTOM:  Right.

6           THE COURT:  So --

7           MR. ALTOM:  No.  That came from Judge Totenberg wanting

8   us to be here today --

9           THE COURT:  Okay.

10          MR. ALTOM:  -- with a corporate representative, and to

11  have done several things.

12          THE COURT:  As a proposed resolution?

13          MR. ALTOM:  Exchanged paperwork.

14          THE COURT:  Okay.

15          MR. ALTOM:  And quite frankly and for the record, the

16  best I could read the order is we've done everything.

17          THE COURT:  Okay.

18          MR. ALTOM:  And Mr. Morgan, except for the filing

19  Tuesday and the one that he submitted to the Court this morning,

20  has done nothing.

21          THE COURT:  Okay.  Mr. Morgan?  Thank you.

22          And let me just say this, too.  Come on up, Mr. Morgan.

23  What may happen today, I see this -- let me let you go ahead and

24  speak first and then I'll say what I think is probably going to

25  end up happening.  No, I'll go on and say what I think.  Looks

1  like we're going to have to continue this, but we'll see.  We'll

2  see.  I'm going to continue it to find out where we are

3  procedurally in the case, too, and maybe with the modification,

4  but let's see what we can do today.

5          Mr. Morgan, your turn.

6          MR. MORGAN:  Okay.  I'll try to put this in some sort

7  of reasonable order.  May it please -- may it please the Court, I

8  am Michael Morgan.  And of course I am the pro se defendant.

9          UNIDENTIFIED VOICE:  Plaintiff.

10         MR. MORGAN:  Pro se plaintiff, yeah.  That's my wife,

11  Angela Morgan.  She's here because she's the ultimate settlement

12  authority.

13         THE COURT:  Okay.

14         MR. MORGAN:  Let me say, as to the modification, I view

15  that really at this stage of the game as a red herring type of

16  issue.  It is inappropriate.

17         And as to Judge Totenberg, she had no reason whatsoever

18  to know about the foreclosure.  It's -- she issued an order on

19  July 7th.  If you read the order that she issued on July 7th,

20  it's obvious in the order that she did not know about the

21  foreclosure at that time.  And there's no -- there's absolutely

22  no reason for thinking or even conjecturing that Judge Totenberg

23  had knowledge about the foreclosure at the time that she issued

24  that.  And there's no -- I don't really believe there's any

25  reason to believe that if she had known about the foreclosure,

1   that she would have issued an ordered, you know, ordering

2   modification.

3           In addition, I would say, modification is a word that

4   might include a lot of different things.  I don't think the

5   representation of a modification at the foreclosure by them is

6   accurate.  I mean, surely you can somehow work out some

7   arrangement if you get everybody involved with the property,

8   which now would include an additional party which is not a party

9   to this action, Freddie Mac.  Sure, if you got everybody

10  together, it is theoretically to work out something, but that's

11  not really -- you know, I think that what Judge Totenberg had in

12  mind was she -- that she was thinking that I occupied the

13  property and that something might be worked out for us and -- you

14  know, and just resolve this thing without a foreclosure going

15  forward.  And that's inappropriate now.

16          And then I'd also say that what -- I don't know if she

17  wants you to speak.

18          THE COURT:  How about writing it down and give him a

19  Post-it?

20          MR. MORGAN:  She's as eager to say something, I guess,

21  as I am, Your Honor, so.

22          But, you know, there's a lot -- I mean, what they sent

23  me was not the only thing that they could do, you know.  It's

24  not -- you know, you could -- you know, you can invent probably a

25  hundred different ways of something you can call modification.

1   You don't have to send a modification that applies to someone who

2   occupies a property when you know they don't occupy the property,

3   you know.  And, you know, there are documents that I'm asked to

4   submit, you know, and some of the documents are to prove you

5   occupy the property.  And they knew that --

6           THE COURT:  Let me stop you right there and ask Mr.

7   Altom.  In order for there to be a modification, do you have to

8   occupy the property, so is he ineligible solely because he does

9   not oc -- that's not his primary residence or he doesn't occupy?

10          MR. ALTOM:  No.

11          THE COURT:  Okay.

12          MR. ALTOM:  I don't know of any restrictions on it

13  being a --

14          THE COURT:  Okay.

15          MR. ALTOM:  -- secondary residence or that he's no

16  longer in the --

17          THE COURT:  Okay.  I just wanted to clear that up.

18          Okay.  Go ahead, Mr. Morgan.

19          MR. MORGAN:  I'm not an expert on HAMP.

20          THE COURT:  No.

21          MR. MORGAN:  But they sent me a specific form of

22  modification, which is -- which is -- you know, it's got terms on

23  it for a specific federal law, specifically for, you know,

24  provide for homeowners.  And I think under that federal law,

25  if -- that for the package that they sent me applies, you know --

1  it doesn't really make sense to me that the -- that the law that

2  Congress recently adopted was for people that weren't occupying

3  property.

4         You know, and as -- again, as I said, there are other

5  ways to do a modification.  They could have approached --

6  proposed something different.  They could have proposed something

7  reasonable, but what they sent is -- I mean, it's a pretty

8  burdensome thing.  I mean, it is so burdensome that Judge

9  Totenberg, in her order, in both of her orders says, you know, if

10 you have difficulty filling -- filling out the paperwork, well,

11 you can go here to get someone to help you do it.  You know, it's

12 unduly burdensome.  And I don't really want to go on endlessly.

13 I mean, I think it's obvious at this stage that it's

14 inappropriate.

15        It's obvious that it doesn't resolve all the issues

16 because, you know, I mean, in addition to the wrongfully

17 foreclosing -- and I really don't think there's an issue about

18 that because Judge Totenberg has already in the order she's got

19 out is taking positions on certain issues and that does

20 necessarily lead to -- to a certain result.  I mean, that's

21 already been ruled on.  They may disagree with Judge Totenberg's

22 opinion.  They may want to appeal Judge Totenberg's opinion, but

23 that opinion is out there and it's fairly clear what is stated in

24 there.

25        I also want to say that the issues are not left to

1   some -- just the residence.  I mean, they wrongfully foreclosed.

2   They wrongfully took possession of the property when they took

3   possession of the property.  They wrongfully went in there, they

4   removed our property and disposed of it.  I mean, there's other

5   things that as a consequence of things that happened while this

6   action is pending which are still out there.  So, I mean, it just

7   doesn't resolve it.

8          And, you know -- and that HAMP modification thing is, I

9   mean, I think it's inappropriate, but it's a thing that's out

10  there for a trial.  They have trial provisions, all these other

11  things where you could do something like that and they can just

12  say no.  That doesn't resolve a case which is litigating in

13  court.  It doesn't resolve it under the terms of the documents

14  that they sent to me.

15         After the -- what he likes to refer to as the TRO,

16  Judge Thrash referred to that as both, I believe, if you'll

17  review the record, a TRO and a preliminary injunction.  The

18  provisions that govern a TRO and would have it go away

19  automatically after a certain period of time do not apply to a

20  preliminary injunction.  And, yes, you can read the minutes of

21  what the judge announced from the bench at the hearing, but the

22  fact of the matter I think is clear if the law is reviewed, is

23  that an order is effective when it is entered.  And it was not

24  entered from the bench.

25         And they're -- I mean, what transpired after the

hearing -- and I knew there was some -- a lot of things that

transpired at the hearing.  I mean, you know, you want to talk

what understandings were where -- basically, you know, I thought,

well, if the judge rules on this, I have an opportunity to come

back and present the arguments -- and, again, this was a rush

thing that was put in the day before the foreclosure sale.  So it

wasn't -- you know, what was initially presented to Judge Thrash

was not -- was hardly anywhere close to what could have been

presented.  And, so, I thought I would have had the opportunity

then to -- you know, from what -- from the point where he -- if

he did dissolve it, to then refile and put in the other

arguments.

          I think it's also obvious that if you read Judge

Totenberg's order, you will see that she thinks that I have a

pretty good claim for injunctive relief.  You know, I realize

it's an order -- a Motion to Dismiss, but that -- but that the

injunctive relief did survive that Motion to Dismiss.  And, you

know, that's -- you know, basically I thought that while the

preliminary injunction was out, it would be honored.

          And as a -- I don't know how many details you really

want me to go into today about the -- about the things, but, I

mean, I did -- I didn't get the foreclosure notice even the

second time until -- you know, after Christmas.  You know, so, I

mean, I was in a very -- a thing, you know.  But even when I got

it, I thought, oh, there's a preliminary injunction out there.

1  Now, I'm not saying that it's entirely their fault.  I think some

2  of it is the fault of whoever mailed the notice because I don't

3  think it was mailed on time.  But -- but I think I also have

4  issues with the postal service, but that's -- there.  But I'm

5  just sort of explaining that.

6         I mean, the injunctive relief, I think if I were

7  presenting the argument for injunctive relief in front of Judge

8  Totenberg, that I would have prevailed and the injunction would

9  still be in place.

10        The modification I'm going to go on and not mention

11  other things, Judge.  I don't think the modification after

12  foreclosure is an appropriate thing.  I also don't think it's --

13  you know, I don't think Judge Totenberg would order it if she

14  knew we weren't in the property.  It wouldn't be ordered to go

15  through a program I don't think we can qualify for.  And I -- I

16  don't -- you know, there's just too much else at stake.

17        You have some questions about what I was saying with

18  the 911 address.

19        THE COURT:  I mean, you know, it was just in the

20  complaint, but I think it's explained now.

21        MR. MORGAN:  Yeah.  You understand it.

22        THE COURT:  Yes, I understand that.

23        MR. MORGAN:  It's a gated community.  The postal

24  service doesn't deliver to addresses.  They have special post

25  office box addresses, and there's no -- you know, I think -- I

1   don't think it was intentional, but I don't think he accurately

2   represented the fact in the first case.  There was -- they were

3   always, always advised of the -- of the 911 address, and I do not

4   believe they were ever given a deliverable address.  I mean, it

5   was -- it was the address they had, you know, but that's

6   something that has passed.

7           But again, one of my -- one of my -- this is a big

8   sticky, isn't it?  One of the things my wife wants me to clarify

9   is that our stuff was taken out of the house, disposed of, and

10  that the house was listed for sale for at least three weeks.

11  And, you know, after --

12          THE COURT:  This is the second -- this is with the

13  second foreclosure, second notice of foreclosure?

14          MR. MORGAN:  Yeah, after that.  Yes.  Right.

15          And, you know, and again I would emphasize with the

16  second thing, the preliminary injunction was still in effect.

17  The notice was wrongfully mailed to me during that time.  The

18  publication and the notice, I believe, was wrongfully done at

19  that time.  And, you know, let's see.

20          (A pause in the proceeding was had.)

21          MR. MORGAN:  Basically, to sort of summarize -- I guess

22  I was summarizing, trying to, the controlling factors in Judge

23  Totenberg's order.  There were certainly I think issues that she

24  believed were -- were sort of -- that the core issue dealt with a

25  challenge to whether MERS could be a -- whether the mortgage --

1　or security deed naming MERS as a nominee was a legal way to do

2　that under Georgia law.

3　　　　　And, then, secondly she looked at the issue -- as a

4　separate and distinct issue, she looked at the -- the questions

5　whether an assignment from MERS to Ocwen could be made, and

6　whether an assignment to -- from MERS to Ocwen would entitle them

7　to foreclose.

8　　　　　And as to the first issue, the question is about MERS,

9　primarily about MERS, she at least at that point was not doing it

10　the way -- the way that I viewed it, so she -- the causes of

11　action got dismissed for -- dismissed for that reason.

12　　　　　And as to the other issue, whether Ocwen was entitled

13　to foreclose, I mean, you know, I realize it was a Motion to

14　Dismiss and you -- some technical ways to look at it, but as to

15　whether or not MERS was entitled to foreclose, the answer is no,

16　they were not entitled to foreclose because they were not the

17　holder of the note.  And it is not -- they could not be called

18　the holder of the note on the basis of the assignment, the

19　alleged -- the alleged purported assignment of the security deed

20　to Ocwen.

21　　　　　Now, in the complaint -- I mean, there's a lot of

22　issues that Judge Totenberg also didn't reach.  She wrote a very

23　good order.  It's very concise.  It gets to the point.  But

24　there's a lot of questions she didn't reach, which I'm not -- I

25　don't think the Court wants us to go into those today --

1        THE COURT:  I have her order and have read it.

2        MR. MORGAN:  -- so I (unintelligible) over the line.

3        Let me just -- as to -- there's other -- as to whether

4 there's other type of bases for settling the matter, I think

5 that's -- other than modification, I think it's obvious.  Whether

6 we're at a point where -- that we could discuss that at this

7 time, I don't know.

8        THE COURT:  No.  What I want to do, I think what I'm

9 going to do now, I think I have enough information.  What I'm

10 going to do, I would like to speak to you and your wife in

11 attorney's conference room.  When I normally do any mediation or

12 settlement, I normally take the group with the least amount of

13 people into the attorney's conference room.  And, so, what I'd

14 like to do is just to take a moment just to speak to you

15 regarding what's going on, the procedure, posture of your case,

16 you know, discuss preliminary versus permanent injunctions,

17 things of that nature, so just give you a little bit more

18 information as to what happens next.  And, so, I'd like to

19 discuss that with you and then, you know, see if we could come to

20 some type of understanding or some type of agreement.  So, I'd

21 like to do that, take the two of you and discuss that for a

22 moment and, you know, we'll see what happens.

23        MR. MORGAN:  Okay.  Thank you.

24        THE COURT:  Court is in recess.

25        (A recess was had.)

1          THE COURT:  Okay.  The Court calls the case of Michael

2  M. Morgan versus Ocwen Loan Servicing, LLC, and Mortgage

3  Electronic Registrations Systems, Inc., as well as MERSCORP, Inc.

4          The Court will note for the record that today the Court

5  held a settlement conference and attempted to mediate the

6  underlying dispute at issue in this case and at this juncture the

7  Court was not able -- the parties were not able to reach a

8  settlement.  Specifically plaintiff does not believe that a

9  modification at this juncture would be appropriate.

10          Okay.  Anything else on behalf of either party?

11          MR. MORGAN:  Nothing further, Your Honor.

12          THE COURT:  Okay.

13          MR. ALTOM:  No, Your Honor.

14          THE COURT:  Okay.  Nothing else in front of the Court,

15  court is in recess.  Have a good day.

16          (End of proceedings.)

17                              *****

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF GEORGIA

3  <u>CERTIFICATE OF TRANSCRIBER</u>

4

5

6          I do hereby certify that the foregoing pages are a true

7  and correct transcript to the best of my ability of the

8  proceedings electronically recorded in the case aforesaid.

9          This the 24th day of April, 2013.

10

11

12

                              _____
13                            ELISE SMITH EVANS, RMR, CRR
                              OFFICIAL COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25